2022 IL App (1st) 182623-U

No. 1-18-2623

August 8, 2022

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois |
| | ) | |
| v. | ) | No. 97 CR 15419 (02) |
| | ) | |
| CLIFTON CARROLL, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WALKER delivered the judgment of the court.
Presiding Justice Hyman concurred in the judgment. Justice Coghlan dissenting.

**ORDER**

¶ 1    *Held*:  Where a defendant convicted of murder presents affidavits of witnesses attesting that defendant did not participate in the murder, and the evidence supports a finding that he acted with due diligence, the court must advance his postconviction petition based on allegations of actual innocence to an evidentiary hearing. Where the State contends defense counsel should have found one of the witnesses by the time of trial, the court should hear evidence on the defendant's claim he received ineffective assistance of counsel.

¶ 2     Following a jury trial, defendant Clifton Carroll was found guilty of the first degree murder of Michael Williams, and he was sentenced to 50 years in prison. This court affirmed his conviction and sentence on direct appeal in *People v. Carroll*, No. 1-01-3184 (June 30, 2004).

¶ 3     Clifton now appeals the second-stage dismissal of his postconviction petition and asks this court to remand for a third stage evidentiary hearing. Clifton attached to his petition affidavits from two witnesses to the murder who stated unequivocally that Clifton did not participate in the murder. Clifton argues that (1) the trial denied him due process rights to a fair determination of his petition, (2) the affidavits constitute new evidence of actual innocence, (3) his trial counsel provided ineffective assistance of counsel by failing to present the testimony of one of the two witnesses at his trial, and (4) his prior postconviction counsel unreasonably conceded that trial counsel was not ineffective for failing to call a key witness.  For the following reasons, we remand for a third-stage hearing on the postconviction petition.

¶ 4                                    I. BACKGROUND

¶ 5     On May 4, 1997, around 1:30 a.m., Michael Williams of the Black Souls street gang walked out of the Three Brothers M.C. lounge on the west side of Chicago. Two members of the Gangster Disciples, Johnell Elem and Derrick Wright, accompanied Williams. Johnny Conwell and a second man came out from behind a nearby truck and fired several gunshots, killing Williams.

¶ 6     Elem spoke to police minutes after the shooting.  He described the shooters as two black men, 5'9" in height, wearing hooded sweatshirts over their heads.  Elem did not tell police he recognized either of the men. One day later, on May 5, 1997, a passenger in a van fired gunshots at Wright and Penny Simmons, killing Simmons.

¶ 7    Elem viewed a police lineup on May 12, 1997. He identified both Conwell and Clifton, both members of the New Breeds street gang, as the two men who shot Williams. Prosecutors charged Conwell and Clifton with the murder of Williams. In a separate indictment, prosecutors charged Conwell and Clifton with the murder of Simmons. At the trial on the charge of murdering Simmons, Wright testified he saw Conwell and Clifton shoot Simmons. The prosecution advanced the theory that Conwell and Clifton murder of Simmons related closely to the murder of Williams. In response to the prosecution's questions, Wright testified that he saw Conwell shoot Williams, but he could not see the second person who shot Williams well enough to make an identification. The court found Conwell guilty of murdering Simmons, but a jury found the evidence insufficient to convict Clifton.

¶ 8    At the trial against Clifton for the murder of Williams, Elem identified Conwell and Clifton as the shooters. He recognized them at the scene, but did not tell police their names because he planned to kill them himself. He identified them in the police lineup because he abandoned the plan to kill them after their arrest.

¶ 9    The prosecution's other eyewitness, Rhusheena Fairman, testified that she was in the Three Brothers lounge when Williams left around 1:30 a.m. on May 4, 1997. She heard gunshots, and then Williams ran back into the lounge and collapsed. She saw Conwell and Martin Crane outside the lounge. She did not see her cousin, Clifton.

¶ 10    Fairman testified that she did not remember what she said to the grand jury. The court permitted the prosecution to introduce a transcript of Fairman's testimony to the grand jury as substantive evidence. Fairman told the grand jury she was outside the lounge when she saw Conwell and Clifton come out of a building and shoot Williams. At the trial Fairman, explained

she said to the grand jury what police wanted her to say. She testified, "I was terrified when [police] came and got us because they were telling me, my mother that they could lock both of us up if I didn't testify."

¶ 11    Detective Allen Jaglowski testified his investigation into Williams's death led him to look for Conwell, Clifton, and a maroon 1983 Cutlass. He went to an apartment where police spotted through an open door a .44 caliber revolver in plain view sitting on the windowsill. After entering the unoccupied apartment, police found two .38 caliber revolvers on the floor and recovered colostomy bags, vials of medication bearing Crane's name, and a police bulletin. The parties stipulated that defendant had a colostomy before November 4, 1996, and that he used colostomy bags throughout May of 1997. The police department's firearms examiner concluded that the guns found in the apartment did not discharge the bullets found in or near Williams.

¶ 12    Police Officer John Rawski testified that on May 12, 1997, four blocks from the apartment where Jaglowski found guns and colostomy bags, he saw Conwell driving, and in a nearby gangway, he saw Clifton. He followed Clifton and found in a garage a 1983 Cutlass wrapped in paper with a coat of paint primer on it. One of the wheels was off and the three other wheels were non-matching.

¶ 13    Clifton' niece, Tiffany Carroll, testified that she, her grandmother, her three cousins, and Clifton, all stayed home on the night of May 4, 1997, to May 5, 1997. Tiffany stayed up until 3 a.m. watching television, and Clifton did not leave the house.

¶ 14    The jury found Clifton guilty of the first degree murder of Williams. The court sentenced him to 50 years in prison. The appellate court affirmed the conviction and sentence. *Carroll*, No. 1-01-3184.

¶ 15    Clifton filed a postconviction petition on June 30, 2006. The trial court dismissed the petition, but this court reversed and remanded for further proceedings. *People v. Carroll*, 2014 IL App (1st) 112531-U. On December 21, 2017, postconviction counsel filed an amended postconviction petition, supported by affidavits from Wright, Conwell, Fairman, and Marc Kadish, Clifton's trial attorney.

¶ 16    Wright said in one affidavit, "I saw two shooters shoot up over a car and shoot at Michael Williams. I identified Johnny Conwell as one of the shooters. I did not identify Clifton Carroll, whom I know as 'Bambi,' as the other shooter because I know for a fact that Bambi was not involved in the shooting. Bambi is tall, and the second shooter was shorter than Bambi." In a separate affidavit he added:

"Because I grew up with Bam, I know how he looks.

*** Bam was not one of the shooters on May 4,1997, neither was Bam present.

*** If Bam was one of the shooters, I would have said it was Bam."

Conwell swore, "I along with Marvin Cra[ne] shot Michael Williams *** on May

4, 1997."

¶ 17    In her affidavit, Fairman said she was inside by the door of Three Brothers when she saw Conwell shoot Williams. She ran back from the door, and she did not see the second shooter. Fairman stated: police "kept insisting after they talked with other's that 'Bam' was the other shooter because he was in a different gang than Michael." She explained her signature on the statement police prepared:

"The police threatened me with being charged with murder if they found out that

'Bam' had did it and that I didn't tell them ***.

I was scared from Michael being shot and the possibility of being shot as well in addition to how the police were threat[en]ing and treating me."

¶ 18    Kadish stated in his affidavit,

"I did not believe Derrick Wright would be helpful as a defense witness because he was difficult to locate.

*** Also, I was uncertain how Derrick Wright would testify since he was a member of an opposing gang. If the State had called him, I was prepared to cross-examine him.

*** Many years after trial I learned that Derrick Wright is unequivocal that Clifton Carroll was not one of the shooters or with the shooters."

¶ 19    Clifton argued, in his amended postconviction petition, that the evidence showed he did not actually take part in the murder of Williams, and Kadish provided ineffective assistance by failing to present Wright as a defense witness. At the hearing on the State's motion to dismiss the postconviction petition, the judge stated:

"[Clifton] had *pro bono* counsel from one of the top law firms in Chicago, Mayer Brown. They were doing this *pro bono*.

You are telling me that they checked out the availability of these witnesses and for obvious reasons didn't call either of these witnesses and somehow his constitutional rights were violated?

***

*** [H]e was represented by pro bono counsel that did a conscientious job. They identified and located the witness that you are talking about, Mr. Wright.

Mr. Wright was interviewed by them and for what appeared to be very clear, correct reasons was not put on the witness stand."

¶ 20    The court also held that the affidavits of Wright, Conwell, Fairman, and Kadish had no new evidence. The court dismissed the postconviction petition, and Clifton now appeals.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, Clifton argues (1) he made a substantial showing of actual innocence; (2) Kadish provided ineffective assistance by failing to call Wright as a witness; (3) postconviction counsel provided ineffective assistance when she conceded that Kadish acted in accord with professional standards; and (4) the trial court improperly relied on evidence outside the record to decide that Kadish provided effective assistance. We review de novo the dismissal of a postconviction petition at the second stage of postconviction proceedings. *People v. Coleman*, 183 Ill. 2d 366, 385, 233 Ill. Dec. 789, 701 N.E.2d 1063 (1998).

¶ 23                                    Actual Innocence

¶ 24    Our supreme court established standards for reviewing claims of actual innocence raised in a postconviction petition.

"Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the

evidence adds to what the jury heard. [Citation.]" *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617.

¶ 25    Clifton contends that Wright's affidavit and Conwell's affidavit constitute newly discovered evidence of actual innocence. Wright admitted that he could not identify the second shooter who accompanied Conwell, but he knew Clifton and he could see well enough to know the second shooter was not Clifton, just from the second shooter's height and body shape.

¶ 26    The State claims the evidence does not count as newly discovered because Clifton would have discovered it before trial if he acted with due diligence. We cannot reconcile the State's argument on this issue with its argument in the same brief that Kadish met all professional standards and provided effective assistance of counsel. Kadish admitted in his affidavit that he did not know before trial Wright would testify that he knew the second shooter was not Clifton. "[A] reasonably diligent defendant may rely on his attorney to conduct his defense ***. An attorney provides ineffective assistance when he fails to conduct an adequate investigation into the evidence concerning the charges against his client." *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 52, 972 N.E.2d 1153. If Kadish, acting with due diligence, failed to discover Wright's potential testimony, that testimony qualifies as newly discovered evidence.  If the evidence does not count as newly discovered, then Kadish's failure to find it supports a finding he provided objectively unreasonable assistance. We hold that by asserting that Kadish met professional standards, the State has conceded the evidence could support a finding that Wright's affidavit constitutes newly discovered evidence.

¶ 27    Conwell's statement includes his confession to murder. At the time of Clifton's trial, Conwell faced charges for that murder. He likely would have asserted his fifth amendment

privilege if Clifton had called him as a witness at Clifton's trial. The reasoning of *People v. Edwards*, 2012 IL 111711, ¶ 38, applies: "While petitioner obviously knew of [the affiant] at the time of trial, the evidence in [the] affidavit apparently was nevertheless unavailable at trial (citation), and the evidence thus qualified as newly discovered. [The affiant] was a codefendant, with a fifth amendment right to avoid self-incrimination. No amount of diligence could have forced him to violate that right if he did not choose to do so." (Internal quotation marks omitted).

¶ 28    Thus, Conwell's affidavit and Wright's affidavit count as newly discovered evidence. No eyewitness testified at Clifton's trial, and they knew the second shooter was not Clifton, so the new evidence is not cumulative of the evidence at trial. To meet the requirements for a claim of actual innocence, Clifton must also allege facts showing the new evidence is "of such conclusive character that it would probably change the result on retrial" *Edwards*, 2012 IL 111711, ¶ 40. Our supreme court explained:

> "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence."
>
> *People v. Robinson*, 2020 IL 123849, ¶ 48.

¶ 29    At trial, Elem was the only witness who identified Clifton as the second shooter. The State also presented a transcript of Fairman's testimony to the grand jury, but she recanted that testimony and explained that police threats led her to lie to the grand jury. No physical evidence tied Clifton

to the murder scene or the guns that killed Williams. Police officers' testimony supported a conclusion that Clifton belonged to the same gang as Conwell and he helped Conwell's efforts to conceal his guilt, but the officers' testimony does not show that Clifton participated in the shooting. Against the weak evidence supporting the conviction, Wright's testimony furnishes especially credible evidence exonerating Clifton. Wright testified against Clifton in the trial for the murder of Simmons, and Wright has not recanted his identification of Clifton in that murder. Wright belonged to a gang in conflict with Clifton's gang. The prosecution has not suggested any motive for Wright to implicate Clifton in the murder of Simmons while falsely exonerating Clifton for the murder of Williams.

¶ 30    The State in its brief suggests Wright's and Conwell's testimony does not exonerate Clifton because Clifton might have been involved as a third shooter, present at the scene along with Conwell and Crane. However, Elem at trial and Fairman in her testimony to the grand jury both stated they saw only two shooters at the scene, and no evidence supports the State's new theory that Conwell, Crane, and Clifton together murdered Williams.

¶ 31    We find that Conwell's affidavit stating that Crane, not Clifton, accompanied Conwell and fired shots at Williams on May 4, 1997, considered together with Wright's affidavit stating the second shooter was shorter than Clifton, constitute material, non-cumulative, newly discovered evidence of actual innocence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. We reverse the dismissal of Clifton's postconviction petition and remand for a third-stage hearing on his claim of actual innocence.

¶ 32                          Ineffective Assistance of Counsel

¶ 33    Clifton argues Kadish provided ineffective assistance of counsel when he failed to call Wright as a witness at trial. Kadish also failed to find out that Wright would testify he knew the second shooter was not Clifton.  Our supreme court has stated that to show ineffective assistance of counsel, Clifton must allege facts supporting a finding Kadish's work fell below an objective standard of reasonableness, and a finding of "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *People v. Patterson*, 192 Ill. 2d 93, 107, 735 N.E.2d 616 (2000).

¶ 34    Kadish admitted in his affidavit that, at the time of trial, he did not know Wright would testify that he saw the second shooter well and saw the shooter well enough to testify the second shooter was not Clifton. The State argued in response to the actual innocence claim that the failure to discover the potential testimony resulted from a lack of due diligence. Hence, the State has effectively conceded that Clifton has presented adequate support for his claim of ineffective assistance. Kadish's work fell below an objective standard of reasonableness.

¶ 35    In addition to the State conceding, the weak evidence against Clifton serves to show that if not for counsel's errors, Clifton had a reasonable chance of achieving a better result. Thus, Clifton has adequately supported his claim for ineffective assistance of counsel, and the claim should advance to the third stage of postconviction proceedings.

¶ 36    Clifton also argues he received ineffective assistance of postconviction counsel. He asks this court to reverse the dismissal of his postconviction petition. As we have already found cause to advance all allegations of the amended postconviction petition to the third stage of postconviction proceedings, we see no need to address separately the claim he received ineffective assistance of postconviction counsel.

¶ 37                                    Judicial Bias

¶ 38     Finally, Clifton argues that the judge's comments at the postconviction hearing showed bias against Clifton's arguments concerning ineffective assistance of counsel because the judge demonstrated an unwillingness to believe that attorneys from Mayer, Brown could have been ineffective.  Clifton asks us to remand with directions to assign a different trial judge to hear the third stage proceedings. "To obtain a remand to a new judge, a defendant must show something more than simply that the judge presided over the defendant's earlier trial. [Citation.] A defendant can show something more by demonstrating *** 'prejudice, predilections or arbitrariness." (internal quotation marks omitted) *People v. Reyes*, 369 Ill. App. 3d 1, 25 (2006).  In *Reyes*, the appellate court directed the appointment of a different judge for proceedings on remand because the trial judge's findings, without evidence, "essentially decided *** the entire case." *Id*. at 26.

¶ 39     Here, at the hearing on the State's motion to dismiss the postconviction petition, the judge stated:

        "[Clifton] had *pro bono* counsel from one of the top law firms in Chicago, Mayer

        Brown. They were doing this *pro bono*.

        You are telling me that they checked out the availability of these witnesses and for

        obvious reasons didn't call either of these witnesses and somehow his constitutional

        rights were violated?

¶ 40     The dissent would find "there is nothing in the record that supports" a finding that the case should be assigned to a new judge on remand. Apparently, the dissent chooses to disregard the judge's assertions about Mayer Brown being "one of the top law firms in Chicago." We strongly disagree with the dissent's position because the judge's comment shows the judge's unwillingness

to countenance a claim that Clifton may have received ineffective assistance of counsel from Mayer Brown. We find that the Judge's comment demonstrated bias in favor of the Mayer Brown law firm.

¶ 41    Supreme Court Rule 366(a)(5) permits a reviewing court, in its discretion, to make any order or grant any relief that a particular case may require. Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994). "This authority includes the power to reassign a matter to a new judge on remand." *Eychaner v. Gross*, 202 Ill. 2d 228, 279, 779 N.E.2d 1115, (2002). We recognize that finding a judge bias is a decision that should not be made lightly. *Eychaner v. Gross*, 202 Ill. 2d 228, 279-80, 779 N.E.2d 1115 (2002). Nevertheless, out of an abundance of caution, we remand this case with instructions that the presiding judge of the criminal division assign further proceedings on defendant's postconviction petition to a different trial judge.

¶ 42                                III. CONCLUSION

¶ 43    Clifton sufficiently supported his claims of actual innocence and ineffective assistance of counsel. We reverse the dismissal of his postconviction petition and advance the case for a third stage evidentiary hearing. Because the judge's comments suggest prejudgment concerning Clifton's claim of ineffective assistance, we direct that the presiding judge assign the case to a different judge on remand.

¶ 44    Reversed and remanded with instructions.

¶ 45    JUSTICE COGHLAN, concurring in part and dissenting in part:

¶ 46    I concur in the judgment that Carroll is entitled to a third stage evidentiary hearing on his actual innocence claims. I disagree that Carroll made a substantial showing that he received

ineffective assistance of counsel at trial. I also disagree that this matter should be assigned to a different judge on remand.

¶ 47   To show ineffective assistance of counsel the defendant must allege facts showing counsel's representation was both objectively unreasonable and that he was prejudiced by counsel's deficiency. *Strickland v. Washington*, 466 U.S. 668, 693 (1984) In establishing that his counsel's performance was deficient under Strickland, "a defendant must overcome a strong presumption that, under the circumstances, counsel's conduct might be considered sound trial strategy." *People v. Houston*, 226 Ill. 2d 135, 144 (2007). In view of counsel's reasonable explanation for his decision not to call Wright to testify at trial, Carroll failed to overcome this "strong presumption."

¶ 48   On May 12, 1997, Carroll and Johnny Conwell were "arrested for participation in three distinct shootings of Penny Simmons, Senica Elem, and Michael Williams," in which "[t]he State sought the death penalty." Carroll was convicted of Elem's murder after a bench trial, but that finding was "changed to not guilty" after "a hearing on a Motion for a New Trial." Carroll was found not guilty of the murder of Penny Simmons after a jury trial. A jury convicted Carroll of the murder of Michael Williams in this case.

¶ 49   Carroll's amended post-conviction petition is supported by an affidavit from Marc Kadish, the lead counsel of Carroll's three attorney defense team. At the time he began his representation, Kadish "was the Director of Pro Bono Activities and Litigation Training and part of the administration of the law firm of Mayer Brown and a member of the Illinois Capital Trial Bar."

¶ 50   During the June 27, 2001, hearing on Carroll's motion for a new trial in this case, Kadish advised the trial court that the defense had located Wright and taken a statement from him before

trial, but thereafter "lost" him and "could not find him again because he did not want to be found, and we still have not been able to find him." When Kadish's investigator interviewed Wright before trial, he "was evasive." Many years later, Wright became "unequivocal that Clifton Carroll was not one of the shooters or with the shooters." As Kadish explained in his 2017 affidavit, he "did not believe [Wright] would be helpful as a defense witness because he was difficult to locate" and he "was uncertain how [Wright] would testify because he was a member of an opposing gang." Wright's two affidavits confirm that his gang was "into a dispute with an opposing gang," he and Carroll were in different gangs, and he had "implicated [Carroll] in the murder of Penny Simmons."

¶ 51    It is well settled that decisions "concerning what witnesses to call and what evidence to present on a defendant's behalf are viewed as matters of trial strategy." *People v. Munson*, 206 Ill. 2d 104, 139 (2002). "Such decisions enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence [citation] and are, therefore, generally immune from claims of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 378 (2000). Unlike situations where "no meaningful adversarial testing was conducted," the record in this case establishes that Wright was a reluctant gang-related witness who had implicated Carroll in another murder. Id. Under these circumstances, Kadish's decision not to call Wright as a witness was "sound trial strategy." Id.

¶ 52    While Wright's 2006 affidavit asserts that he knew Carroll was not the second shooter because "[Carroll] is tall, and the second shooter was shorter than [Carroll]," Wright never identified the second shooter, and his 2017 affidavit acknowledges that "[i]t was dark and the shooters were wearing black hoodies" and "[t]he shooters' skin complexion appeared to be dark

like other males who were in an opposing gang." Although Wright claims that "if [he] had been subpoenaed [he] would have come to court and told the truth," and did not "remember speaking to [Carroll]'s defense attorney or a defense investigator," he does not deny doing so.

¶ 53    The majority asserts that "if not for counsel's errors, Clifton had a reasonable chance of achieving a better result." However, "[s]atisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81. As this court noted on direct appeal, "the uncontroverted testimony of Elem alone provides a sufficient basis to convict [Carroll]." People v. Carroll, No. 1-01-3184 at 17 (June 30, 2004) Carroll failed to show "that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). Therefore, the trial court properly dismissed his ineffective assistance claim.

¶ 54    Even assuming, arguendo, that Carroll was entitled to an evidentiary hearing on his ineffective assistance claim, the record does not justify assigning this case to a different judge on remand. "Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." *People v. Faria*, 402 Ill. App. 3d 475, 482 (2010). Here, the judge stated that Carroll "had pro bono counsel from one of the top law firms in Chicago, Mayer Brown *** [Wright's] opinion or his level of confidence in what he had to say about the case was not strong at the time of the trial and Marc Kadish made a strategy decision not to put him on the witness stand but now many years later he feels more firm in his position about what he would have to contribute at the trial *** Can we fault Mr. Kadish for that?" The judge's comments do not suggest a belief that attorneys from Mayer

Brown could never be ineffective, only that attorneys from Mayer Brown were not ineffective in this case.

¶ 55    During the hearing on the State's motion to dismiss the amended petition, the judge inquired: "You're telling me that they checked out the availability of these witnesses and for obvious reasons didn't call either of these witnesses and somehow his constitutional rights were violated?" In ruling on the motion, the judge explained, "He was represented by pro bono counsel that did a conscientious job. They identified and located the witness that you are talking about, Mr. Wright. Mr. Wright was interviewed by them and for what appeared to be very clear, correct reasons was not put on the witness stand." The judge's comments properly reflected his opinion on the issues presented during the hearing.

¶ 56    Generally, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings," do not support a bias or partiality challenge. *Liteky v. United States*, 510 U.S. 540, 555 (1994). Here, the judge issued a ruling based upon the evidence presented during the hearing, the arguments of counsel, and the applicable law. As recognized by our Supreme Court, "To conclude that a judge is disqualified because of prejudice is not *** a judgment to be lightly made." *People v. Vance*, 76 Ill. 2d 171, 179 (1979). In my view, there is nothing in the record that supports the majority's judgment that the judge should be disqualified in this case.

¶ 57        For these reasons, I respectfully dissent in part from the majority's decision.